Lisa BENDER; Morris Braggs, A Minor, By Mrs. Mary Braggs, His Guardian ad Litem; Toni Robb; Robin Kriner; Kerry Hunter, A Minor, By Mr. & Mrs. Carl Hunter, Her Guardians ad Litem; Brenda Kay Herzog, A Minor, By Mr. & Mrs. Louis Herzog, Her Guardians ad Litem; Shawn Seevers, A Minor, By Mr. & Mrs. Gerald Seevers, His Guardians ad Litem; Peter Strayer, A Minor, By Mr. & Mrs. Charles Strayer, His Guardians ad Litem; Bruce Brossman, A Minor, By Mr. & Mrs. Bruce Brossman, His Guardians ad Litem; and Denise Marshall, A Minor, By Mr. & Mrs. Dennis Marshall, Her Guardians ad Litem, and all others similarly situated, Appellees,

v.

The WILLIAMSPORT AREA SCHOOL DISTRICT; Oscar Knade, Superintendent of the Williamsport Area School District; Richard F. Eberhart, President of the Williamsport Area School Board; Janet C. Harris, Member of the Williamsport Area School Board; G. Kent Bitner, Member of the Williamsport Area School Board; Arthur E. Duncan, Member of the Williamsport Area School Board; Joyce S. Hershberger, Member of the Williamsport Area School Board; Richard L. Merk, Member of the Williamsport Area School Board; Gene Smith, Member of the Williamsport Area School Board; Kermit Smith, Member of the Williamsport Area School Board; John C. Youngman, Jr., Member of the Williamsport Area School Board; and Wayne A. Newton, Principal of the Williamsport Area High School.

Appeal of John C. YOUNGMAN, Jr., one of the Defendants.

No. 83–3284.

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1984.

Decided July 24, 1984.

As Amended on Denial of Rehearing and Rehearing In Banc Aug. 15, 1984.

540

John C. Youngman, Williamsport, Pa., for appellants.

Gerald W. Seevers, Williams & Seevers, Williamsport, Pa., Samuel E. Erickson, Kimberlee W. Colby, Curran Tiffany, Springfield, Va., James M. Smart, Jr. (argued), Smart & Whitehead, Kansas City, Mo., for appellees.

Patrick Monaghan, Stephen F. McDowell, Catholic League for Religious and Civil

Rights, Milwaukee, Wis., Gerry J. Woods, Iovine & Woods, P.C., Philadelphia, Pa., for amicus curiae the Catholic League for Religious & Civil Rights in support of appellees.

Robert Reinstein (argued), Alan Lerner, Barry E. Ungar, Mann & Ungar, P.A., Philadelphia, Pa., for amici curiae American Jewish Congress and Anti-Defamation League of B'Nai Brith in support of appellants; Marc Stern, New York City, Fred J. Berg, Philadelphia, Pa., Justin J. Finger, Jeffrey Sinensky, Ruti Teitel, New York City, of counsel.

John W. Baker, Baptist Joint Committee on Public Affairs, Washington, D.C., for amici curiae Baptist Joint Committee on Public Affairs & The National Ass'n of Evangelicals in support of appellees.

Lee Boothby, Boothby, Huff & Yingst, Berrien Springs, Mich., for amicus curiae Americans United for Separation of Church and State in support of appellants.

William B. Ball, Phillip J. Murren, Sandra Wise, Ball & Skelly, Harrisburg, Pa., for amici curiae Mr. & Mrs. Dale Bluman et al. in support of appellees.

Before ADAMS, and GARTH, Circuit Judges, and BROTMAN, District Judge.*

## OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal requires us to resolve the tension between the first amendment free speech claim of high school students meeting in an activity devoted to prayer, and a school district's claim that the Establishment Clause—also found in the first amendment—overrides free speech guarantees in the context of a "limited forum." We resolve this conflict between the two

constitutional guarantees in favor of the Williamsport Area School District.

Plaintiffs-Appellees Lisa Bender, et al., are or were students at the Williamsport Area High School. It was their desire to form a student organization within the high school, which would be devoted to prayer and other religious activities, and which would meet during the regularly scheduled student activity period. The school officials, fearing violation of the Establishment Clause of the first amendment, denied the students permission to meet.

The students brought this suit for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging violation of their constitutional rights of free speech and free exercise of religion. After considering the affidavits, stipulations, and depositions of the parties, the district court granted summary judgment in favor of the school district and against the students on the free exercise claim.[1] Relying, however, on *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the district court agreed with the students that their free speech rights had been abridged, and that, under these circumstances, the Establishment Clause did not provide a compelling state interest to justify that abridgement. The court therefore granted summary judgment in favor of the students and against the school district on the free speech claim.[2] *Bender v. Williamsport Area School District*, 563 F.Supp. 697 (M.D.Pa.1983). We conclude that the Establishment Clause concerns expressed by the school district must prevail. We therefore reverse.

### I.

Because this appeal comes to us from the grant of summary judgment, and given the crucial role which the particular

---

* Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey, sitting by designation.

1. No appeal or cross appeal was taken from this order, nor was the free exercise issue raised in the briefs or at oral argument, and we therefore have no occasion to consider it.

2. Although the district court entered summary judgment, it did not award explicit injunctive relief against the Williamsport School District. Since the time of the court's judgment, however, the school district has apparently allowed students to meet for religious activities during the regular activity period, in compliance with the district court's opinion.

facts play in every first amendment analysis, special care must be taken in reciting the factual setting. Although, in several respects, the record below could have been more fully developed, we agree with the district court that there are no material disputes of fact that would preclude consideration of the merits of this case in the context of summary judgment.[3]

### A. The Proposed Activity

Plaintiffs, Lisa Bender, et al. (hereinafter described collectively as "the students") are or were enrolled[4] at the Williamsport Area High School in Williamsport, Pennsylvania. They sought to organize a group known as "Petros," which would "meet for the purposes of [students] aiding each other in his social, emotional and intellectual personal growth and development by prayer, the application of God's Holy Word to their problems and sharing of personal experiences." Complaint ¶ 31, App. at 7. The purpose was also stated to school authorities in the group's application for approval:

#### PROPOSAL FOR A NEW STUDENT ORGANIZATION

##### NAME OF THE ORGANIZATION
πετρα [sic] (the Rock)

##### NATURE OF THE ORGANIZATION
The organization will be a non-denominational prayer fellowship. Participation will be voluntary and open to all students.

##### PURPOSE OF THE ORGANIZATION
The purpose of the organization will be to promote spiritual growth and positive attitudes in the lives of its members.

##### LEADERSHIP
Selection of leaders will be by democratic election. The leaders will be responsible for directing the meetings and coordinating activities in a manner that will carry out the purpose of the organization.

##### MEETINGS
Regular meetings of the organization will be held on school premises during the Tuesday and Thursday morning activity periods. They will include Scripture reading, discussion, prayer and other activities which may be of interest to the group.

##### SUPERVISION
Meetings of the organization will be supervised by a faculty advisor. Student attendance may be verified by the signing of a roster.

App. at 87 ("Proposal for a New Student Organization"). The students asked permission to meet during the school's regularly scheduled activity period. They agreed that they would not use the bulletin boards, newspaper, or public address systems to promote their meetings. App. at 401 (Affidavit of Lisa Bender).

---

3. Furthermore, we note that, in the area of "constitutional fact," an appellate court is free to draw its own inferences from the record. E.g., Block v. Potter, 631 F.2d 233, 241 (3d Cir. 1980). As the Supreme Court recently noted in another first amendment context, the Constitution requires that judges must exercise independent appellate review "in order to preserve the precious liberties established and ordained by the Constitution." Bose Corp. v. Consumers Union of United States, Inc., —— U.S. ——, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). As a result, we do not defer to the same extent to factual inferences drawn from the record by the district court, as we might in a case not involving constitutional, and in particular, first amendment rights. Factual findings by the district judge or a more developed record, therefore, would not necessarily be required to add to our understanding and analysis. We find that the essential undisputed facts which underlie this case are sufficient on which to predicate our legal conclusions.

4. Since commencement of this action, all the named plaintiffs have graduated from the high school. Although begun as a class action, no such class was ever certified by the district court. Before us, however, is a motion to add additional plaintiffs who are currently enrolled at Williamsport Area High School and who likewise desire to participate in the activities of the Petros Club. Because the issue presented by this appeal is capable of repetition, see generally Super Tire Engineering Co. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), and because we perceive no prejudice to the school district, we grant this motion.

Petros was allowed to hold one organizational meeting, at which approximately forty-five students were present. During the meeting, passages of scripture [5] were read, and students who wished to do so, prayed. After this first session, however, the school administration withheld permission for further meetings pending investigation as to their legality. After consultation with the school's attorney, the Williamsport School Board denied the student's request for permission to meet. The President of the School Board wrote to Bender, stating:

The solicitor [has] advised the Board that to approve your proposal would be a violation of existing case law and therefore, an improper action. The Board decided, therefore, to deny your appeal.

Please be assured that neither the School Board nor the Administration regard the proposed prayer fellowship group as being unworthy. Present law simply does not permit public schools to authorize or support religious activities on school property.

App. at 235 (Letter of R.F. Eberhart).

### B. The Activity Period

The activity period at Williamsport Area High School is held during a thirty minute time slot regularly provided on Tuesdays and Thursdays, during which student groups may conduct meetings.[6] The school day begins at 7:45 a.m. when all students must be in their homerooms. School supervision of students begins the moment they enter the school premises. App. at 356 (Affidavit of Principal Wayne Newton). The activity period starts at 7:57 a.m., after attendance has been taken in homeroom and the school day has begun. Those students who do not participate in a club may study in the library, visit the school's computer station, examine career or college placement materials, or simply remain in their home rooms until the next class period begins. Participation in activities is completely voluntary, although each student must be on school grounds and accounted for during the activity period. Pennsylvania law requires that students participate in a minimum amount of instruction per year, which is variously calculated as: (1) 180 school days per year, with each day consisting of seven hours, minus 1½ hours for lunch and breaks; (2) a school week consisting of 27½ hours of instruction; or (3) 990 hours of instruction each year. Pa.Stat.Ann. tit. 24, § 15–1504 to 1504 (Purdon Supp.1983).[7] App. at 366 (affidavit of Principal Wayne Newton).

In the memory of the current principal, who has served since 1974, no proposed student club or activity has ever been denied school sponsorship, other than Petros.[8] The only articulated qualification as to the

---

**5.** The record does not reveal from what source this scripture was derived.

**6.** Statutory provision for extracurricular activities in Pennsylvania public schools is contained in Pa.Stat.Ann. tit. 24, § 5–511 (Purdon 1962 & Supp.1983), which provides:

(a) The board of school directors in every school district shall prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding (1) the management, supervision, control, or prohibition of exercises, athletics, or games of any kind, school publications, debating, forensics, dramatic, musical, and other activities related to the school program, including raising and disbursing funds for any or all of such purposes and for scholarships, and (2) the organization, management, supervision, control, financing, or prohibition of organizations, clubs, societies and groups of the members of any class or school, and may provide for the suspension, dismissal, or other reasonable penalty in

the case of any appointee, professional or other employe, or pupil who violates such rules or regulations.

. . . .

(c) The board of school directors may permit the use of school property, real or personal, for the purpose of conducting any activity related to the school program, or by any school or class organization, club, society, or group, (2) authorize any school employee or employes to manage, supervise and control the development and conduct of any such activities, (3) employ or assign any school employe to serve in any capacity in connection with any such activities.

**7.** We are not told if the activity period count toward the minimum requirement at Williamsport, nor have our own attempts at calculation provided a definitive answer.

**8.** As described in a recent school yearbook, student clubs which are currently active include:

nature of the activity allowed during this period is that it *"contribute to the intellectual, physical or social development of the students and is otherwise considered legal and constitutionally proper."*[9] App. at 367 (Affidavit of Principal Wayne Newton).

It is the policy of the school that each student club have an adult advisor, who is usually a member of the faculty, but may also be another school employee or a parent. App. at 404 (Stipulation of Parties). There is no written policy "concerning the role of adult advisors of . . . clubs or who those adult advisors must be,"[10] *id.,* although an advisor or monitor must be present at each student meeting. App. at 366 (Affidavit of Principal W. Newton). The principal has final approval over who the advisor will be. At the first meeting of Petros, a monitor was present, but used the time to grade papers and took no part on the meeting. App. at 228, 402 (Affidavits of L. Bender).

## II.

Our analysis will proceed along these lines:

First, did the student members of Petros have a free speech right guaranteed by the first amendment? To answer this inquiry, we will have to examine whether the school district created a forum, and if so, what kind, i.e. was it "public" or "limited," and if "limited," in what manner?

Second, if, as we conclude, the Williamsport school district did create a forum, limited to accommodating student activities which would promote the intellectual and social development of its students as part of the secondary school educational process, then did the students in the Petros program come within the prescribed parameters of that limited forum so created?

Third, assuming an affirmative answer to the preceding inquiries, may the school district validly object to the presence of Petros within the school, based on the potential violation of the Establishment Clause? The answer to this question, in turn, depends on an analysis of the three pronged *Lemon* tests: (1) would permitting the activity within the school day have a

---

Student Government; Key Club (a student service organization performing community work); Class Organizations (officers for each class); Business English Club; Future Homemakers of America (devoted to learning good home practices and providing service to various charity organizations); Vocational Technical Club; Spanish Club; Speech and Drama Club; Ecology Club; The *Cherry & White* (student literary art magazine); *Billtown Banner* (student newspaper); *La Memoire* (student yearbook); Band; Choir; Office Aides (assisting in filing, answering telephones, and running errands).

Other clubs which have been approved in the past and might be renewed if interest warranted are the Archery; Art; Audubon; Aviation; Bowling; Chemistry; Chess; Field, Forest and Stream; Future Nurses; Future Teachers; German; Poetry; Photography; and Ski Clubs. App. at 367. (Affidavit of Principal W. Newton).

There is no formal mechanism or procedure for applying for school sponsorship or sanctioned status at Williamsport, other than oral and possibly written request as was done by the students wishing to have Petros recognized as a school activity. *Id.*

**9.** Oscar Knade, Superintendent of the Williamsport Area School District, made the following

description of the activity period during his deposition:

Q: Could you tell me why the Williamsport School District decided to permit student clubs to meet on a general basis?
A: In addition to providing an academic environment, the school district also attempts to provide opportunities to explore certain interests which may have general value to themselves and to the community, service clubs, service organizations or organization [sic] [which are] built around a specific academic interest, such as language club, German club, for example.
Q: This is—could you characterize the purpose of being to help them to grow, not only academically but socially, emotionally, things of that nature?
A: Certainly.
App. at 275–76 (Deposition of Superintendent Oscar Knade).

**10.** During depositions, the principal of the high school commented that, generally speaking, the adult supervisor participates in the student group meetings. He stated that "I would expect them to be there as somebody who's going to help the students." App. at 266 (Deposition of Principal Wayne Newton). The principal did not state, however, that such active participation by the advisor was a prerequisite for school sanction.

secular purpose; (2) would permitting the activity have the primary effect neither of advancing nor inhibiting religion; and (3) would permitting the activity avoid excessive government entanglement with religion? *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 447 (1971) and *infra* note 20.

Lastly, if we conclude, as we do, that allowing Petros to meet within the school would violate the Establishment Clause, then which of the two provisions of the first amendment should control, where the students, on the one hand, have a free speech right, but the school district, on the other hand, would be in violation of the Establishment Clause if it permitted the religious activity and speech of Petros? The last stage of our analysis, therefore, requires a balancing process, which, when given effect, we believe sustains the action taken by the Williamsport school district.

III. The Students' Free Speech Rights

We turn then to the first of the substantive legal issues involved in this case. It is the student's contention that, by denying Petros access to the activity period, the school district impinged upon their constitutional rights. Indeed, in order to prevail on their claim, the students must first satisfy us as a threshold matter that they enjoy a first amendment free speech right which was abridged by the refusal of the school district to grant Petros permission to meet. Absent this free speech right, there would be no basis upon which a court could intervene in the operation of a local high school. As the Supreme Court has noted:

> Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values.

*Epperson v. Arkansas*, 393 U.S. 97, 104–05, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). It is therefore our task at the outset to decide whether such constitutional values are in fact "directly and sharply" implicated.

A. *Public or Limited Forum*

 In determining the nature of the free speech protections which exist within the school, we of course take note of the general axiom that students do not shed their rights to freedom of speech or expression at the schoolhouse gate. *E.g., Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Nor is speech any less protected because it is religious in nature. *See Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). As Justice Powell, writing for the Court in *Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981), stated, "religious worship and discussion ... are forms of speech and association protected by the first amendment."

 On the other hand, the mere fact that speech is involved and the free speech clause of the first amendment is invoked does not require the government to open the use of its facilities as a public forum to anyone desiring to use them. *See Perry Educational Association v. Perry Local Educators Association*, 460 U.S. 37, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). As the Supreme Court has noted, the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). The State, like any other property owner, can close traditionally non-public facilities from use as a forum for advocacy. *Perry*, 103 S.Ct. at 955; *Widmar v. Vincent*, 454 U.S. 263, 266–67, 102 S.Ct. 269, 272–73, 70 L.Ed.2d 440.

We noted in *International Society for Krishna Consciousness v. New Jersey Sports & Exposition Authority*, 691 F.2d 155 (3d Cir.1982), that:

The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used. Streets, parks and sidewalks are the paradigms of a public forum because they have traditionally served as a place for free assembly and communication by citizens....

....

Public forum status is not appropriate for a locale where the full exercise of First Amendment rights would be inconsistent with the "special interests of a government in overseeing use of the property."

*Id.* at 160 (quoting *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980)).

A high school, unlike the public streets and parks, is not by tradition a forum for public expression. *See Perry*, 103 S.Ct. at 955. Clearly, use of school premises as a public forum by anyone or any group desiring to avail themselves of full and unrestricted use of first amendment rights would disrupt the educational purpose of a secondary school and thus be "inconsistent with the special interests of the government." The Williamsport Area School District, therefore, would have been justified in refusing to reserve high school property for use as a public forum for expression, and would violate no constitutional constraints in doing so. *See Seyfried v. Walton*, 668 F.2d 214 (3d Cir.1981) (students had no first amendment right to use school drama facilities in order to produce play of their choice).

The Supreme Court, however, has held that, when the state decides, albeit on its own motion, to open its facilities for use as a "limited forum," for particular purposes, it assumes a responsibility to explain its exclusion of a qualified group under applicable constitutional criteria. "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 103 S.Ct. at 955. *See Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (public forum for a limited purpose such as use by certain groups); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–59, 95 S.Ct. 1239, 1244–47, 43 L.Ed.2d 448 (1975) (municipal theater was constituted as "public forum," and therefore city could not exclude a particular dramatic production without satisfying constitutional safeguards); *see also City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (free speech rights attach at school board meeting opened to public).

Although the State may create a "limited forum" for particular groups or specific activities, *Perry*, 103 S.Ct. at 955 n. 7., it may not exclude expression that falls within whatever objective parameters it has set. Nor may it exclude a group which is otherwise eligible to use the facility. *See Perry*, 103 S.Ct. at 956 (free speech right to limited forum extends to activities "of similar character").

### B. *Widmar v. Vincent*

It is in the context of distinguishing between a public forum, and a limited or limited open forum, that we examine *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the principal case upon which the students and the district court rely. In *Widmar*, students at the University of Missouri sought permission, as did the students in Williamsport, to use school facilities for religious activities. They formed a group known as "Cornerstone," and for a time were allowed to hold meetings on school premises. The university withdrew that permission, however, citing school regulations against use of its facilities "for purposes of religious worship or religious teaching."

In a suit brought by members of Cornerstone, the Supreme Court held that, by

opening its facilities for general use by campus groups, the university *had* created a forum for its students, and thus it could not make content-based discriminations against particular groups absent a compelling state interest.[11] As Justice Powell noted in writing for the Court:

> Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups. Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place.

454 U.S. at 267–68, 102 S.Ct. at 273. The Court continued:

> Here UMKC [the University] has discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion. These are forms of speech and association protected by the First Amendment. In order to justify discriminatory exclusion from a public forum based on the religious content of a group's intended speech, the University must therefore satisfy the standard of review appropriate to content-based exclusions. It must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.

*Id.* at 269–70 (citations and footnoted omitted).

## C. *The Activity Period at Williamsport as a Forum*

*Widmar*, of course, bears many similarities to the present case, at least insofar as the students' free speech rights are concerned. In both situations, there exists a policy of open access to state-owned facilities in an educational setting, a policy which certainly implies the existence of some type of forum.[12] Indeed, it is the very nature and purpose of any school, be it college or high school, to communicate knowledge. *See Tinker*, 393 U.S. at 512, 89 S.Ct. at 739 (public school meant to promote "intercommunication among the students"). The fact that *Widmar* involved a *university*, while we here are concerned with a *high school*, does not mean that we are free to ignore the nature of the free speech rights enjoyed by the students. As is discussed below, however, the opportunity to exercise those rights is not necessarily coextensive with that which exists in an adult environment.

As the Court has noted, "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972). As recent history has demonstrated, the university campus often serves as the spawning ground for novel theorems and intellectual ferment. It should hardly be surprising that there exists within the university (a sanctuary for the heretical as well as the orthodox) the means and facilities by which ideas may be presented and challenged through interactive discussion. The "ability to participate in the intellectual give and take of campus debate ... [would be] limited by denial of access to the customary media for communication with the administration, faculty members, and other students." *Id.* at 181–82, 92 S.Ct. at 2346. The university, therefore, is—at least for its students—a most logical location for an open forum, albeit one limited to the student body.

---

**11.** *Widmar* went on to hold that the Establishment Clause did not provide a compelling state interest in that case. *See infra* discussion contained in Part IV. *See generally* Note, *The Rights of Student Religious Groups Under the First Amendment to Hold Religious Meetings on the Public University Campus,* 33 Rutgers L.Rev. 1008 (1981).

**12.** *Widmar* and the present case are also similar, however, in that use of facilities was restricted to students. Any forum created would therefore be "limited" at least to the extent that it is not open to the general public. *See Perry,* 103 S.Ct. at 955 n. 7 (noting that *Widmar* involved a "limited open forum" which was restricted as to groups which could use facilities).

The educational mission of a high school, in contrast, is more circumscribed. The curriculum consists less of, and indeed is less conducive to, an unfettered inquiry. As a secondary school, emphasis is placed more on a structured program "for 'inculcating fundamental values necessary to the maintenance of a democratic political system.'" *Board of Education v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (Brennan, J., for the plurality). Local school boards therefore commonly "establish and apply their curriculum in such a way as to transmit community values,' and 'there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political.'" *Id.; accord, id.* at 876, 102 S.Ct. at 2812 (Blackmun, J., concurring); *id.* at 889, 102 S.Ct. at 2819 (Burger, C.J., dissenting); *id.* at 896, 102 S.Ct. at 2823 (Powell, J., dissenting); *id.* at 913–14, 102 S.Ct. at 2831–32 (Rehnquist, J., dissenting).[13]

Since elementary and secondary schools, unlike universities, are not the academic battleground for clashes among contending lines of thought, particularly since the level of student maturity rarely reaches the more advanced level of those attending college, it is unlikely that school authorities would seek to create a truly open forum in a high school environment for unregulated dialogue and inquiry. Because of the inherent nature of a secondary. school, any forum created has purposes which are narrower, and uses more exclusive than a forum such as in *Widmar* or one open generally to all forms of communication by the public. In determining the type of forum,

if any, created by secondary school authorities such as the Williamsport Area School District, therefore, we must take into account, among other things, the level of maturity of the students and the nature of the academic program involved. *See Seyfried*, 668 F.2d at 219 (Rosenn, J., concurring) ("court can take judicial notice of the progressively higher levels of intellectual and emotional development of students in the later grades of secondary school"); *see generally Tinker*, 393 U.S. at 506, 89 S.Ct. at 736 (first amendment must be "applied in the light of the special characteristics of the school environment").

■ Nevertheless, nothing precludes the existence of a forum in a high school setting. The best indication of the accommodation afforded in this case to the students comes from the school district principal's own description of the activity period, in which he states that *"any student activity or club which is considered to contribute to the intellectual, physical or social development of the students"* would likely be approved.[14] The roster of clubs which exist or have existed at Williamsport reveals a wide range of pursuits and interests, which do not indicate adherence to any curricular plan or educational scheme, beyond this general criterion. *See supra* note 9. Indeed, as the district court noted and as the school authorities themselves stated, no organization proposed by students has ever been denied permission to meet during the activity period. The record therefore reveals that the activity period at Williamsport Area High School provides a forum for self-expression, by which students exercise their own discre-

---

**13.** As Justice Rehnquist noted in *Pico:*

Education consists of the selective presentation and explanation of ideas. The effective acquisition of knowledge depends upon an orderly exposure to relevant information. Nowhere is this more true than in elementary and secondary schools, where, unlike the broad-ranging inquiry available to university students, the courses taught are those thought most relevant to the young students' intellectual development. Of necessity, elementary and secondary educators must separate the relevant from the irrelevant, the appropriate from the inappropriate. Determining what

information *not* to present to the students is often as important as identifying relevant material. This winnowing process necessarily leaves much information to be discovered by students at another time or in another place, and is fundamentally inconsistent with any constitutionally required eclecticism in public education.

*Board of Educ. v. Pico*, 457 U.S. 853, 914, 102 S.Ct. 2799, 2832, 73 L.Ed.2d 435 (Rehnquist, J., dissenting).

**14.** *See supra* note 9 and accompanying text.

tion in deciding which organization, if any, to support. Indeed, unlike compulsory instructional classes, which are created and designed by the school authorities, the very existence of such organizations depends entirely upon voluntary student participation and interest.

Unlike the case of prisons [15] or military bases,[16] the exercise of this qualified freedom to participate in the group of one's choice is quite consistent with the special purpose for which the high school is intended—the preparation of youth for adult life and adult decisions. It is true that other school boards may have preferred to limit permissible club activities to those which were directly related to a particular curricular offering, but that is not the case here. It is apparent on this record that the Williamsport school district finds merit in its activity period as an educational tool,[17] and we agree with the district court that there is no indication, nor indeed any contention made, that the activity period is tied to the formal curriculum of the school.[18] *See Bender*, 563 F.Supp. at 707. Thus, the latitude allowed to student groups, and the manner in which it encourages students to exercise independent judgment, supports the conclusion that the Williamsport Area School District did indeed create a forum—

albeit a limited one—restricted to high school students at Williamsport and also restricted to the extent that the proposed activity promote the intellectual, physical, or social development of the students. *See International Society for Krishna Consciousness*, 691 F.2d at 160 (noting in dictum that, "[s]ince the exchange of ideas is an essential part of the educational process, but the need for discipline and order is great, a public high school is probably a limited forum").

■ We therefore must determine whether the activities of Petros fall within the parameters of the limited forum as it exists at Williamsport. It is clear to us that religious discussion, religious study, and even prayer, fall within the articulated qualification that student organizations promote the intellectual and social welfare of students. The Constitution, of course, in no way requires that, because establishment of religion is forbidden, religious activity must be deemed unintellectual or irrelevant to a student's social growth. Since the scope of the activity period has been framed in terms so broad that virtually any program which can be said to benefit the development of the students is per-

---

**15.** *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prison not a public forum).

**16.** *See Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military installation not a public forum).

**17.** Presumably, the Williamsport school authorities enacted the activity period pursuant to Pa. Stat.Ann. tit. 24, § 5–511 (Purdon 1962 & Supp. 1983), quoted *supra* note 6. None of the parties has suggested that implementation of such an activity period was, as a matter of state law, beyond the school board's power and discretion. While it is true that the statute refers to "activities related to the school program," that clause is capable of broad interpretation, and would not necessarily limit activity periods to organizations linked directly to a curricular offering. There has been no inference, nor do we find support for the contention, that the statute forbids the kind of broad activity period allowed in Williamsport.

**18.** Another indication that the activity period is not curriculum-related can be derived from the

identity of some of the clubs presently approved or approved in the past. *See supra* note 8 (listing student clubs). For instance, the Key Club, a service and community organization, has little direct relevance to normal course offerings. Likewise, the Chess Club, the Aviation Club, and the Office Aides, among others, have at best only tangential relation to a high school course of study.

While it might be said that each of these activities enhances the curricular goals of the school by promoting civic awareness (the Key Club), logical thought (the Chess Club), practical applications of scientific principles (Aviation Club), or a general sense of responsibility (Office Aides), the same extended chain of reasoning could be used to justify religion as a promoter of civic, social, and intellectual values. Thus, the roster of activities approved in the past reveals no more restrictive a limitation on the activity period than that which has already been articulated, i.e., that clubs promote the "intellectual, physical, or social development of the students."

missible, we are able to conclude without further discussion that the activities of Petros fall within the bounds of a "limited forum" as it exists at Williamsport Area High School. The students members of Petros, therefore, have a valid first amendment interest to engage in their proposed activity.

### IV. The Establishment Clause

Having found that a limited open forum was created within the high school, such that the students' free speech rights were implicated, we must now determine whether the school may constitutionally impose restrictions on those rights.

■ It first should be noted that the restriction which the School Board would seek to place on "Petros" is content-based, since it is undisputed that the students were denied permission to organize Petros solely because their activity was religiously oriented. Thus, any restriction which was placed on Petros cannot be justified as a "time, place or manner" limitation, which must be content neutral. *E.g., Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647–48, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981). Moreover, because the restriction imposed by the school district in denying permission for Petros to meet is content-based, Williamsport ("the State") must demonstrate that it is narrowly drawn to meet a compelling state interest. *E.g., Widmar*, 454 U.S. at 270, 102 S.Ct. at 274. The sole justification advanced by Williamsport for denying Petros permission to organize is that such permission might violate the Establishment Clause. As noted in *Widmar*, "the interest of [the school] in complying with its constitutional obligations *may* be characterized as compelling." *Id.* at 271, 102 S.Ct. at 275 (emphasis added). We first examine the situation presented in Williamsport to de-

termine if in fact an Establishment Clause violation would be made out if Petros were allowed to meet.

■ The relevant text pertaining to the Establishment Clause appears in the first amendment as "Congress shall make no law respecting the establishment of religion...."[19] *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1970) articulated the traditional test for whether state action comports with the Establishment Clause. The three prongs of the test are: (1) does the proposed action have a secular purpose; (2) would it have the primary effect which neither advances nor inhibits religion; and (3) would such action avoid excessive government entanglement with religion? Unless all three inquiries are answered affirmatively, the action taken by the state violates the Establishment Clause. Transposed to the instant case, we frame the questions to be answered as follows: (1) if the school district had permitted Petros to conduct its activity, as the Petros students desired, would that permission, if granted, have a secular purpose; (2) if the school district permitted Petros to meet, would that action neither advance nor inhibit religion; and (3) assuming that the school district allowed the Petros activity, in doing so would it avoid excessive school or government entanglement with religion? If the answer to all three of those questions is uniformly "yes," then no Establishment Clause violation would have occurred if permission to Petros had been granted and the school district would then have erred in denying Petros' right to meet, because then its action encroached upon the students' free speech rights.

On the other hand, if *any* one of those three questions, as we have stated them, is answered "no," then the school district has

---

**19.** U.S. Const., amend. I. The amendment provides in full:

Congress shall make no law respecting an establishment of religion; or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to peti-

tion the Government for a redress of grievances.

The Establishment Clause has been made applicable to the states by incorporation into the fourteenth amendment. *See Everson v. Board of Educ.*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–512, 91 L.Ed. 711 (1947).

raised a palpable and legitimate Establishment Clause defense, and the analysis must continue to determine whether, in this case, the merits of that defense are sufficient to override the students' free speech claims.[20]

## A. Secular Purpose

Perhaps the most fundamental requirement of the Establishment Clause is that state action have a valid secular purpose, and that religious considerations may not motivate governmental decisions. A purpose which is nonsecular, however, will not be inferred lightly. Lynch, 104 S.Ct. at 1362–63 (1984). In the present case, no assertion has been made that the Williamsport School District created the activity period for anything other than valid educational purposes. Indeed, it would be highly ironic if the school district, which has been opposing introduction of Petros into the school environment throughout this litigation, and which has prosecuted this appeal in an effort to vindicate its judgment that the Establishment Clause prevents Petros' activity, were to be charged with a religious motive or with intent to benefit religion because it has sought to accommodate all student programs. The secular benefit of establishing such an activity policy is manifest.

We therefore conclude that, in establishing a general activity program of the type disclosed by the record, Williamsport had no religious objective or nonsecular purpose. See Brandon v. Board of Education, 635 F.2d 971, 978 (2d Cir.1980), cert. denied, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). Its stated purpose, as we have discussed earlier, was only to "contribute to the intellectual, physical or social development of the students." See supra note 9 and accompanying text. Thus, we have no reservation in answering "yes" to Lemon's first question: "would granting permission to conduct Petros' activity have a valid secular purpose?"

## B. Primary Effect: Would Permitting Petros to Meet Advance or Inhibit Religion?

We encounter greater difficulty in considering whether the second Lemon test has been satisfied, i.e. whether the policy of allowing religious groups access to an otherwise open forum would have the effect of advancing religion. Justice O'Connor, in her concurring opinion in Lynch v. Donnelly, —— U.S. ——, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) states the issue thus: "[w]hat is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion."

The question of religious "effect" was discussed extensively in Widmar. The Court noted, inter alia, that the policy of accommodating religious groups in university facilities would not lead to the perception that the school was promoting religion. "University students are, of course, young adults. They are less impressionable and should be able to appreciate that the University's policy is one of neutrality toward religion." 454 U.S. at 274 n. 14, 102 S.Ct. at 276 n. 14. The Court also found that granting a religious organization permission to use school facilities "would no more commit the University ... to religious goals' than it is 'now committed to the

---

**20.** Although the Court has recently noted that the Lemon tests are not the exclusive criteria for determining whether the Establishment Clause has been violated, Lynch v. Donnelly, —— U.S. ——, 104 S.Ct. 1355, 1361–62, 79 L.Ed.2d 604 (1984), we observe that the Widmar analysis was confined to the three pronged Lemon test. Indeed, it has been urged upon us by the student members of Petros that this case is no more than an extension of Widmar. We also observe that the district court employed the same Lemon analysis. Recognizing that the Lynch discussion (creche in public area) involved a wholly different aspect of the Establishment Clause than is pertinent here, where religious activity in public schools is at issue, we are persuaded that the analytical framework set out above is the appropriate mechanism by which to measure the school district's actions. Indeed, in Lynch itself, even though it involved different considerations, and even though it indicates that there may be other tests to determine if the Establishment Clause has been breached, the Court, significantly, applied only the tripartite Lemon test.

goals of the Students for a Democratic Society, the Young Socialist Alliance,' or any other group eligible to use its facilities." *Id.* The Court noted that the forum at the University of Missouri was available to over one hundred student organizations. "The provision of benefits to so broad a spectrum of groups is an important index of secular effect." *Id.* at 274, 102 S.Ct. at 277. The Court therefore concluded that allowing a religious group to meet on campus would not violate the Establishment Clause. In Justice O'Connor's terms, as expressed in *Lynch,* allowing a religious group to meet on a public university campus would not have the effect of communicating a message of government endorsement of religion. *See Lynch,* 104 S.Ct. at 1368.

In the matter before us, however, different considerations present a more serious question of state advancement or endorsement of religion than was present in *Widmar.* All are an outgrowth of the differences between a high school and a university. While we discussed in Part III of this opinion that such differences did not dictate a result contrary to the result reached in *Widmar* insofar as the students' free speech rights were concerned, we find that the special circumstances inherent in a high school create heightened dangers in the context of the Establishment Clause. This difference between a secondary school and a university distinguishes *Widmar* from this case.

As the *Widmar* Court itself noted, high school students stand in a very different position than university students in terms of maturity and impressionability. 457 U.S. at 274 n. 14, 102 S.Ct. at 276 n. 14, *accord, Tilton v. Richardson,* 403 U.S. 672, 685–86, 91 S.Ct. 2091, 2099–2100, 29 L.Ed.2d 790 (1971). They thus would be less able to appreciate the fact that permission for Petros to meet would be granted out of a spirit of neutrality toward religion and not advancement. Compounding this problem is the more obvious presence which a religious group would unavoidably have within a high school setting. Unlike universities, attendance for most high school students is made compulsory by state law. Moreover, high school instruction is given in a structured and controlled environment and in more confined facilities than is usual in the open, free, and more fluid environment of a college campus. Thus, the possible perception by adolescent students that government is communicating a message of endorsement of religion if it permitted a religious group to meet would be vastly different in a high school setting than the perception of such action by college students in a college setting.

In Williamsport, for instance, meetings of Petros would be held in a classroom which, a few minutes after the meeting, is also used for regular secular classes. Within this more restricted environment, therefore, involuntary contact between nonparticipating students and religious groups is inevitable. Students of differing or conflicting creeds would therefore be less able to overlook the activities of such a group within their school, and by the same token would be more likely to perceive a message of endorsement by school authorities that religious activities were approved.

Moreover, the record here discloses that such activity was to be monitored by a teacher, parent, or other adult. It is true that the monitor was not required to participate in the program's activities, although many adult supervisors did so. As we have noted earlier, the principal of the high school stated that he would "expect them [the adult monitor] to be there as someone who's going to help the students." *See supra* note 10. At the first Petros meeting, a monitor was present, but took no part in the proceedings. While the students in their affidavits characterized the monitor's activities as benign and neutral, designed only to maintain order, it is readily apparent that a school teacher or someone associated with the school necessarily must impart the impression to students that the school's authority and that the school's endorsement is implicated in the relevant activity, since every monitor must be approved by the school. Even a parent undertaking the role of monitor would nec-

essarily be perceived as a school authority. It goes without saying that no such authority figure or government endorsement was part of the *Widmar* activity program, undoubtedly because of the age and maturity difference of the students. When the monitor factor is added to the other considerations which we have discussed under the "effects" test of *Lemon,* it becomes evident that, if Petros were allowed to meet under these circumstances, Williamsport would be perceived as endorsing and encouraging religious practice.

The constitutional significance of the fact that organized religious activity occurs within the physical confines of a public school, and given its foreseen effects as well as the established limitations placed on school accommodation and involvement, is demonstrated by the coordinate cases of *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), and *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). In *McCollum,* the Court considered the propriety of using public classrooms for voluntary religious instruction, during the hours of compulsory attendance. It found such a practice violative of the Establishment Clause, noting that:

> The foregoing facts ... show the use of tax-supported property for religious instruction and the close cooperation between school authorities and the religious council in promoting religious education. The operation of the State's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects. Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend religious classes. This is beyond question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment ....

333 U.S. at 209–10, 68 S.Ct. at 464.

In *Zorach,* however, the Court approved the practice of allowing students release time so that they could attend religious instruction away from the school during class hours. It noted that "this 'release time' program involves neither religious instruction in public classrooms nor the expenditure of public funds." 343 U.S. at 308, 72 S.Ct. at 681. Thus, the only affirmative act by the school was allowing students to leave the premises early. The Court found no constitutional infirmity when "[t]he public schools do no more than accommodate their schedules to a program of outside religious instruction." *Id.* at 315, 72 S.Ct. at 684. Reading *McCollum* and *Zorach* in conjunction, therefore, reveals the sensitivity of the Court's concerns when the subject of public school accommodation of religious activity is involved.

In the present case, the activity period in which Petros would meet occurs within *school* classrooms *during the hours of compulsory attendance.* It therefore presents many of the circumstances which *McCollum* found constitutionally unacceptable. We recognize that the facts of this case and those of *McCollum* differ, since in *McCollum,* there was no valid secular purpose in providing classrooms for religious instruction, and therefore it arguably did not meet even the first *Lemon* test. Moreover, in *McCollum,* only religious activity was allowed special access to school facilities, while here such access is provided to wide range of groups as part of a larger program of extracurricular activity. Nevertheless, the Court did not find special treatment of religious activity to be constitutionally defective in *Zorach,* provided that such activity was removed, and took place *away* from the school premises. We find that distinction to be critical.

 Seeking to ameliorate the impact of religious activity within the school, the students emphasize that their activity is "non-denominational," and therefore its existence within the school would not induce the social fragmentation and divisiveness which the Establishment Clause was intended to prevent. We cannot ignore, however, the reality that, in practice, any

meaningful religious activity must cater to some subset of spiritual beliefs and exclude others. By definition, at the least it excludes those who espouse no religious beliefs at all.[21] We believe that once activity is found to be religious, as the activities of Petros concededly are, then the potential for divisiveness and sectarian dispute is raised, no matter how accommodating the actual practice may be.[22] It is therefore not appropriate for us to inquire further into the teachings in question in order to determine whether they embrace an ecumenical spirit.

Unlike a university, where it is generally understood that a student is, with reason, responsible for the conduct of his or her own affairs, the behavior of a high school student is subject to the constant regulation and affirmative supervision of adult school authorities. Indeed, during the time that students are present on school premises, the State does stand, in large measure, *in loco parentis*. As we noted earlier in this opinion, there are some limitations as to the manner of regulation which the school may impose when students attempt to exercise rights of expression. Yet we think it asking much of a thirteen, fifteen, or seventeen year old student to comprehend the subtleties and intricacies of the first amendment about which judges and legislators themselves find reason to pause.[23] It is the rare case in which high school students attempt to engage in programmed activity during the hours of compulsory attendance without the permission,

---

**21.** We note that the very name by which the group in Williamsport chose to call itself has special significance for the Christian faith. The "Petros" is a transliteration of the Greek word πετρος ("rock") and is the root of the Latin words "Petrus" ("Peter") and "petra" ("rock"). It figures prominently in the New Testament:

> Et dico tibi, quia TU ES *PETRUS*, ET SUPER HANC *PETRAM* AEDIFICABO ECCLESIAM MEAM, & portae inferi non praevalebunt adversus ea. [Vulgate Version].
> And I say to you that THOU ART *PETER*, AND UPON THIS *ROCK* I WILL BUILD MY CHURCH, and the gates of Hell shall not prevail against it. [King James' Version]
> *Matthew* 16:18. Indeed, the Latin version of the text highlighted above is inscribed on the inner dome of St. Peter's Basilica in Rome, which according to legend is literally "built upon" the bones of St. Peter.

**22.** We believe that once an activity is deemed to be "religious," the degree of partisanship toward a particular denomination does not, and cannot, affect the constitutional analysis. If religious activity is to be allowed under the rubric of free speech, then it must be permitted without further regard to its content, i.e. whether or not it is "nonsectarian." The only issue which can be relevant to the establishment clause analysis is the threshold determination of whether the challenged activity is indeed "religious," as the activity here admittedly is.

Indeed, if the courts were to establish the degree of sectarianism as a part of the Establishment Clause tests, then they would themselves be engaging in impermissible entanglement by the very act of applying those tests, since it is not appropriate in this context for the judiciary to evaluate contrasting theologies. As the Supreme Court has noted, it is a difficult enough task to determine whether a particular activity is indeed "religious." *Widmar,* 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11. (quoted *supra.*) Making a further determination as to whether such activity is partial to a particular sect is well beyond the pale of judicial functions.

**23.** *See Religious Speech Protection Act: Hearing on H.R. 4996 Before the Subcomm. on Elementary, Secondary, & Vocational Education of the House Comm. on Education & Labor,* 98th Cong., 2d Sess. (1984); *Equal Access Act,* H.R. Rep. No. 710, 98th Cong., 2d Sess. (Report to House to accompany H.R. 5345); Amendment No. 3152 to S. 1285, 98th Cong., 2d Sess. (1984); 130 Cong.Rec. H3855–79, H3901 (daily ed. May 15, 1984) (House debate on H.R. 5345); 130 Cong.Rec. S8331–S8370 (daily ed. Jun. 27, 1984) (Senate Debate on Amendment No. 3152 to S. 1285). Both H.R. 4996 and H.R. 5345 would have provided that no federal education funds may be obligated or expended to any state or local educational agency which discriminates against meetings of students in public secondary school who wish to meet voluntarily for religious purposes. Amendment No. 3152 to S. 1285 would provide a civil remedy to protect group prayer activity which took place outside of school hours.

*See generally* Drakeman & Seawright, *God and Kids at School: Voluntary Religious Activities in the Public Schools,* 14 Seton Hall L.Rev. 252 (1984); Comment, Widmar v. Vincent *and the Public Forum Doctrine: Time to Reconsider Public School Prayer,* 1984 Wis.L.Rev. 147 (1984); Note, *Religious Expression in the Public School Forum: The High School Student's Right to Free Speech,* 72 Geo.L.J. 135 (1983); Note, *The Constitutional Dimensions of Student-Initiated Religious Activity in Public High Schools,* 92 Yale L.J. 499 (1983).

much less in defiance of the wishes of the school, and are successful.

■ Activity which is permitted to exist within the school, therefore, especially when conducted in the constant presence of school-appointed monitors, carries with it the impression of official approval and endorsement, particularly when the state compulsory educational system encourages attendance at meetings of such groups.

As noted by Justice Frankfurter:

The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools, to avoid confusing not to say fusing, what the Constitution sought to keep strictly apart.

*McCollum*, 333 U.S. at 231, 68 S.Ct. at 475 (Frankfurter, J., concurring). Since it is the public schools which provide the most prolonged and involved contact which our youth enjoy with the State, and indeed, for many, the public schools may appear as an institutional symbol for the government in general, any practice which communicates sanction by the school of religious activity amounts to an Establishment Clause violation. The second question we posed at the outset of this analysis asks "if the school district permitted Petros to meet, would that action neither advance nor inhibit religion?" Our discussion reveals that the answer, in light of the authorities and the record in this case, must be "no," and we are therefore left with the conclusion that the presence of religious groups within the school during the curricular day has the effect of advancing religion, in that it communicates a message of government endorsement of such activity. *See Lynch v. Donnelly*, —— U.S. ——, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring).

We do not suggest that a school board has a duty to propagate falsehood among its students by denying the very existence of religion. "The metaphor of a 'wall' or impassible barrier between Church and State, taken too literally, may mislead constitutional analysis." *Gillette v. United States*, 401 U.S. 437, 450, 91 S.Ct. 828, 836, 28 L.Ed.2d 168 (1971). However, the Establishment Clause does become implicated when the existence of religion within the school creates the perception among schoolchildren that the State has approved a religious activity and thus has placed its imprimatur on religion. We believe that the danger of communicating such state approval of religion is presented in this case.

### C. Excessive Entanglement

Since we have already determined that the primary or direct effect of permitting Petros to meet would be to advance religion, we need not dwell overly long on consideration of the third prong of the test, i.e. whether permitting Petros to meet would engender "excessive entanglement" with religion.

As distinct from the "effects" test, which is concerned with the substantive effect of state action, the entanglement test is "essentially a procedural problem."[24] *Roemer v. Board of Public Works*, 426 U.S. 736, 755, 96 S.Ct. 2337, 2349, 49 L.Ed.2d 179 (1976) (Blackmun, J., for the plurality). Government must avoid excessive entanglement with religion where "continuing state surveillance will inevitably be required to ensure that [the] restrictions [of] ... the First Amendment [are] respected." *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114. The usual setting for an entanglement clause violation is when a state official, in order to avoid giving state aid to religion, must make determinations as to what activity or material is religious in nature, and what is secular, and therefore permissible. *See Lemon*, 403 U.S. at 615–22, 91 S.Ct. at 2112–2116; *see also New York v. Cathedral Academy*, 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977).

**24.** *But see Roemer v. Board of Public Works*, 426 U.S. 736, 755, 768–69, 96 S.Ct. 2337, 2355, 49 L.Ed.2d 179 (1976) (White, J., concurring) (excessive entanglement test is redundant and accomplishes no more than secular effect test under a different label).

■ We have already discussed, in the context of the "effects" test, the fact that Petros would conduct its activity during the school day, within school premises, and under the official supervision of a school monitor, thus lending the official support of the school at Petros meetings, and putting the school in a position of governance over religious activity. It would also appear that these circumstances, apart from their applicability to the effects test, create the type of "intimate and continuing relationship" between church and state with which the entanglement test is concerned. *See Lemon*, 403 U.S. at 621–22, 91 S.Ct. at 2115–2116.

Furthermore, we note that Petros, in an attempt to lessen the effect of the Establishment Clause on the permissibility of their meetings, represented that it would voluntarily agree not to use the school's bulletin boards or public address system in connection with their activities. This arrangement in itself, however, raises entanglement concerns. In order to enforce this agreement, school authorities would be required to police the activities of Petros as new students took over the organization, to insure that no religiously oriented material was posted on the bulletin board, published in the school newspaper, or announced over the public address system. If any such material could indeed be free of religious content, a matter about which we have some doubt because of the nature of the Petros activity, the school officials would be constantly required to interpret the posted announcements in order to distinguish religious from non-religious content. It is this very situation, however, which the entanglement test addresses. "[I]f the state must engage in continuing administrative supervision of nonsecular activity, church and state are excessively intertwined." *Brandon*, 635 F.2d at 979.

We reach this conclusion with the knowledge that, in the context of a *university*, the *Widmar* Court has suggested that prohibition of religious meetings may actually exacerbate entanglement:

We agree with the Court of Appeals that the University would risk greater "entanglement" by attempting to enforce its exclusion of "religious worship" and "religious speech." Initially, the University would need to determine which words and activities fall within "religious worship and religious teaching." This alone could prove an impossible task in an age where many and various beliefs meet the constitutional definition of religion. There would also be a continuing need to monitor group meetings to ensure compliance with the rule.

*Widmar*, 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11 (citations omitted). We have doubts, however, that *Widmar* dictates that the prohibition of religious activity from a public high school itself creates an excessive entanglement. Although it would, to some extent, require the surveillance of school authorities in order to ensure compliance with this restriction, we note that such supervision has already existed at least implicitly in our schools since the Supreme Court interpreted the Constitution as banning officially organized prayer. *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 840 (1963). It would be somewhat peculiar to suggest that the Supreme Court itself created excessive entanglement in so doing. And recently, in *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 3071, 77 L.Ed.2d 721 (1983), the Court held that the entanglement test is not violated when state officials are required to distinguish secular textbooks from religious textbooks, at least on the simpler and less eclectic level of the secondary school curriculum.

In considering the entanglement feature of the *Lemon* tests, moreover, at least as applied to the Williamsport school district situation, our unease stems not so much from the metaphysical concerns which we have just recited, but more from the fact that the activities in which Petros intends to engage will be conducted during school hours, on school premises, and under official school supervision, and thus be subject

to the possibility of state and school liability and to the school's responsibility to maintain safety, order, and a secular schedule. *See Brandon,* 635 F.2d at 979. The discharge of these functions by the school not only gives the appearance of official state endorsement of religion, but, in practice, would require involvement by school officials in activities proscribed by the Establishment Clause. If, for example, a student member of Petros objected that a prayer would violate his or her religious beliefs, the school monitor could very well be put in a position of settling such a controversy and thereby involve the school's authority in reaching a determination with respect to the validity of various religious beliefs and practices.

Thus, to answer the third *Lemon* test question which we put: "assuming that the school district allowed the Petros activity, would it avoid excessive school entanglement with religion," the answer must undoubtedly be "no."

## V. Reconciling Free Speech with the Establishment Clause

Our analysis has thus advanced to that aspect of this case which is, in many ways, the most troubling. We have already concluded that the students of Petros enjoy a free speech right to engage in religious activity.[25] We have also held, however, that allowing such religious activity would violate the mandate of the Establishment Clause. We are thus faced with a constitutional conflict of the highest order. Moreover, in deciding *Widmar,* the Supreme Court explicitly declined to "reach the questions that would arise if state accommodation of free exercise and free speech should, in a particular instance, conflict with the prohibitions of the Establishment Clause." 454 U.S. at 273 n. 13, 102 S.Ct. at 276 n. 13. We are therefore left with no definitive guidance from the Court as to the proper direction to take in this unique circumstance.

### A.

Two other courts of appeals have addressed circumstances comparable to those presented here, but for various reasons did not reach the ultimate question raised in this case of how to reconcile free speech with the proscriptions of the Establishment Clause. In *Lubbock Civil Liberties Union v. Lubbock Independent School District,* 669 F.2d 1038 (5th Cir.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983), the Fifth Circuit considered a suit brought against the school district challenging that district's stated policy of accommodating individual student prayer. No student claiming first amendment rights was a party to that suit however, and thus the constitutional conflict present here was not properly before the *Lubbock* court.[26] It should be noted that *Lubbock*

---

**25.** While our analysis to this point is compatible with that found in *Brandon v. Board of Education,* 635 F.2d 971 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981), we do not read *Brandon* as holding that high school students, such as those who are members of Petros, would have a valid first amendment interest to engage in religious speech. *See infra* text at pp. 559–560, discussing *Brandon.* That interest, as we have discussed earlier, was firmly established by *Widmar. Brandon,* it should be noted, was filed approximately a year before *Widmar* was decided.

**26.** In response to the *Lubbock school district's* argument that it was merely attempting to protect the students' free speech and free exercise rights, the *Lubbock* court did note that a high school was not converted into a public forum merely because student meetings were held

there, and thus it found that there was no free speech right implicated which might prevail against Establishment Clause concerns. *Lubbock Civil Liberties Union v. Lubbock Independent School District,* 669 F.2d 1038, 1048 (5th Cir.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

*Lubbock* did not, however, analyze the factual setting in depth to determine whether there was an intent by school officials to accommodate student expression sufficient to create a forum. Nor are there sufficient facts recited in the opinion by which it can be determined independently whether such a forum could indeed have been found to exist. Presumably the absence of a properly presented free speech claim by an aggrieved student made that analysis unnecessary in *Lubbock.* We do not think that the general statements made by the Fifth Circuit about the *Lubbock* High School, therefore, need be construed as conflicting with our conclusion

involved a situation in which the school district itself attempted to promote religious activity by adopting a policy explicitly tailored to accommodate only such programs and no others. *See Lubbock*, 669 F.2d at 1041 n. 7 (quoting school district's policy on religious activity). Moreover, the Lubbock School District had a long history of attempting to promulgate policies which sanctioned organized religious programs within the school. *Id.* at 1039–40. The *Lubbock* court found, therefore, that the policy of accommodating religious groups had a nonsecular purpose, a circumstance not present here. It thus appears that *Lubbock* did not present a true conflict between free speech and the Establishment Clause. In *Brandon v. Board of Education*, 635 F.2d 971 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981), a group of students seeking to engage in voluntary prayer asserted their own rights to free speech against a school district which denied them permission to meet on school property. The Second Circuit found, as we do here, that such activity raised concerns which are addressed by the Establishment Clause. The court did not, however, address the conflict with which we are confronted, since it found that "a high school was not a 'public forum' where religious views can be freely aired," and therefore there was no countervailing free speech right. *Id.* at 980. While it noted that high school students may have a right to political speech under *Tinker*, "sensitive Establishment Clause considerations limit their right to air religious doctrine."[27] *Id. Brandon*, however, was decided prior to the Supreme Court's determinations in *Widmar*, and therefore it did not have the benefit of that instructive decision in its evaluation of the students' expression rights. We therefore treat this question as one of first impression.

B.

In creating two clauses within the Constitution which at times are in unavoidable tension, we can only assume that the Framers intended some sort of compromise and accommodation to be reached between them. Although the Supreme Court has noted, for instance, that the Establishment Clause "may" provide a compelling state interest which would override free speech rights (*Widmar*, 454 U.S. at 271, 102 S.Ct. at 275), it clearly did not state that such supersession would be automatic whenever the two clauses conflict. Such a holding would place the Establishment Clause in a position of permanent supremacy over the free speech clause, a constitutional hierarchy which we do not think the Framers intended. We must therefore probe for flexibility within each provision, recognizing that neither clause can be absolute in its terms and effect when it is in conflict with the other.

▇▇▇▇ This element of compromise already exists within traditional free speech analysis, since the right to expression can be curtailed when a compelling state interest is present. We believe that the Establishment Clause, perhaps somewhat more indirectly, allows for the same accommodation. Examining the *Lemon* tests, it can be seen, for instance, that only *excessive* entanglement in religion is prohibited. "Excessive" is of course a relative term whose meaning may change with the circumstances, and therefore the restrictions derived from this test may be less encompassing when a conflicting free speech right is involved.

Likewise, the second *Lemon* test, i.e. whether the primary effect of the proposed action would be to advance or inhibit religion, also does not deal only in absolutes. The underlying analysis is whether an action has such a strong influence which affects religion that it has broached the per-

---

that a type of forum did exist at the *Williamsport* Area High School.

**27.** Under our analysis, of course, the Establishment Clause is part of an affirmative *defense* against a free speech claim, not a limitation on the *definition* of that right. We may not, therefore, avoid the constitutional conflict by using the Establishment Clause to find in the first instance that no speech right exists.

mitted boundaries, and should therefore be labelled as "primary." *See Widmar*, 454 U.S. at 273–75, 102 S.Ct. at 276–77 (weighing several factors in determining if effect is "primary"). Although framed in terms of "primary" and "indirect" effect, when actually deciding whether a given action impermissibly advances or inhibits religion, the ultimate judgment is still one of degree. Whether an action has the undue effect of advancing religion is therefore not a black or white decision; rather, at some point on a continuum one reaches the breakpoint, beyond which the effect is impermissible and thus qualifies as "primary." That breakpoint, however, is never rigidly fixed: rather, it may vary if pressed by another fundamental constitutional interest. In the words of Chief Justice Burger, writing for the Court in *Lynch v. Donnelly*, —— U.S. ——, 104 S.Ct. 1355, 1361–62, 79 L.Ed.2d 604 (1984):

> In each case, the inquiry calls for line drawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause "was to state an objective, not to write a statute." The line between permissible relationships and those barred by the Clause can be no more straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.

(Citations omitted).

■ Thus, while it is true that the Establishment Clause *might* provide a compelling state interest to restrain speech, it does not do so in every case. The parameters of the Establishment Clause may bend somewhat in order to accommodate another fundamental interest—free speech, just as the speech clause must, depending on the circumstances, accommodate the objectives of the Establishment Clause.

In those cases in which there is a true and uncontrived conflict between the free speech clause on the one hand, and the Establishment Clause on the other, we believe that the appropriate analysis requires weighing the competing interests protected by each constitutional provision, *given the specific facts of the case*, in order to determine under what circumstances the net benefit which accrues to one of these interests outweighs the net harm done to the other. Recognizing that, under these circumstances, some constitutional protections must unavoidably be abridged, we believe that our role is to maximize, as best as possible, the overall measure of the fundamental rights created by the Framers, by deciding which course of action will lead to the lesser deprivation of those rights.[28]

■ We therefore turn to consideration of the circumstances before us. The facts of this case concededly present a close question. In sum, however, we conclude that the interest in protecting free speech within the context of the activity period as it exists at Williamsport Area High School is outweighed by the Establishment Clause concerns described earlier.

First, although we have found that the students did enjoy a free speech right to engage in religious activity within the activity period, that right exists only within the context of a "limited forum." The continuation of that right is therefore at the

---

**28.** We recognize that, in normal course, once a constitutional right has been duly established, the courts may not refuse to give it effect by rationalizing away its importance in a particular setting. We limit this analysis to the unique situation presented here, in which two constitutional provisions are in direct conflict, and thus where it is impossible to avoid deciding which of the two must control.

In undertaking this analysis, we also emphasize that we do not attempt to evaluate the *worth* of the actual activity which is protected either by the free speech clause or the Establishment Clause. Thus, in this case, the value of the ideas which Petros sought to convey through its meetings is irrelevant to our determination. Rather, all that we examine is the value and significance of the *opportunity* which the particular circumstances afford to utilize those rights, in order that we may know what amount of constitutional protection would be lost if that opportunity were sacrificed.

complete discretion of the school authorities, who may abolish the activity period altogether, or limit it to strictly curricular subject matter,[29] which would not embrace the religious communication engaged in by Petros.

The opportunity for expression which would be lost if this limited forum were closed to religious speech, therefore, would not be one to which the students enjoyed an absolute right of entitlement, but rather one which existed in the first place only as permitted by school officials. Moreover, the loss of that opportunity would be compensated in substantial measure by alternative means of communication which exist throughout the community. Although it cannot be said that the loss of the high school as a meeting place would not impose an inconvenience upon the students of Petros, we are not persuaded that it would impair the practical ability of such a group to conduct its activities in a meaningful way, if it is forced to do so outside of the school premises and at times other than during school hours.

Second, public schools have never been a forum for religious expression. The free speech right enjoyed by the students is therefore of a dramatically different character than the right to communicate in a traditional public forum such as a park or on a sidewalk, or through the press, where the overriding importance of allowing free expression has been deeply and firmly rooted throughout our history.

On the other hand, the Establishment Clause dangers described in Part IV above would be unavoidable, and to a large extent unremediable, if Petros were granted access to school facilities during the curricular day. We cannot escape the conclusion that such group activity, when conducted within the hours of compulsory attendance, on school premises, and under official sanction and supervision, would promote an impermissible atmosphere of religious partisanship in a public secondary school, which the Establishment Clause requires must be free of such divisiveness.

We therefore conclude that, in balancing the respective constitutional interests which would be lost and gained if Petros were granted access to the activity period, as against those which would be lost and gained if it were not granted access, there is a greater vindication of the protections of the Constitution if the Establishment Clause prevailed in this instance, as we hold that it does. To this extent, therefore, it can be said that the interest of Williamsport in complying with its constitutional obligations provides a compelling state interest. *See Widmar,* 454 U.S. at 271, 102 S.Ct. at 275. Under other circumstances, of course, this same analysis could work to override the Establishment Clause, if a sufficiently compelling interest were shown. We need not address those circumstances here, however, since the record in this case does not lend itself to such a conclusion.

## VI. CONCLUSION

We are not unaware of the importance of the constitutional issues presented in this case, nor of the delicacy which resolution of this case entails. It is out of respect for that delicacy, however, that we have been cautious not to overstate the breadth of our decision.[30]

---

**29.** *See* Pa.Stat.Ann. tit. 24, § 5–511 (Purdon 1962 & Supp.1983), quoted *supra* note 6.

**30.** The dissent has characterized our holding as a "bright line" *per se* rule: "no prayer in public secondary schools." Dissent, at 562, 569. If the dissent means to say that we have adopted a *per se* rule that *group* prayer activity, held *on school premises,* conducted as part of an *organized high school* activity program, at which a *school monitor* must be present, and which takes place during the hours of *compulsory school attendance,* violates the Establishment

Clause, then that characterization is accurate. Without these critical qualifications, however, the dissent mischaracterizes our holding.

Because each additional fact and factor impacts so heavily upon a school prayer analysis in a determination as to whether the particular circumstances pass constitutional muster, we feel it necessary to be precise in considering the relevant facts leading to a particular conclusion. For example, *compare* H.R. 5345, 98th Cong., 2d Sess. (1984) (allowing voluntary group religious activity *before, during and after* school hours) *with* Amendment No. 3152 to S.1285, 98th

Some twenty years ago, the United States Supreme Court banned officially organized prayer and Bible readings in the public schools. *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Since that time, courts have been faced with repeated attempts to re-introduce prayer into the public schools under a variety of different guises. *See, e.g., Treen v. Karen B.*, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (statute authorizing voluntary student or teacher initiated prayer at the beginning of the school day held unconstitutional); *May v. Cooperman*, 572 F.Supp. 1561 (D.N.J.1983) (statute authorizing a one-minute period of silence at the beginning of the school day held unconstitutional).

The public schools have traditionally represented, in the words of Justice Frankfurter, "the symbol of our democracy and the most pervasive means for promoting our common destiny." *Illinois ex rel. McCollum v. Board of Education*, 333 U.S. 203, 231, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948). They serve to instill in our children "an appreciation of critical reasoning, a commitment to democratic institutions, and a dedication to principles of fairness." *Brandon v. Board of Education*, 635 F.2d 971, 973 (2d Cir.1980), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981). Thus, it is imperative that divisive forces be eliminated from the school environment. *See McCollum*, 333 U.S. at 231, 68 S.Ct. at 475 (Frankfurter, J., concurring), *quoted supra* p. 555.

Instead of uniting students from varying backgrounds and beliefs, prayer in the public schools segregates students along religious lines. This works to the detriment of all students, and may particularly ostracize and stigmatize those students who are atheists or adhere to religious beliefs not shared by the majority of their fellow students. The peer pressure inherent in a high school environment exaggerates the ostracism which may be experienced by nonconforming students, especially if they see student leaders or favorite teachers participating in the prayer club. *See Brandon, supra*, 635 F.2d at 978. Accordingly, we are of the view that "Sacred practices of religious instruction and prayer, [as] the Framers [of the Constitution] foresaw, are best left to private institutions—the family and houses of worship." *Id.* at 973.

Our decision has no impact upon the rights of high school students to engage in speech protected by the first amendment which does not involve the Establishment Clause dangers present here. We only hold that the particular circumstances disclosed by this record and present at the Williamsport Area High School lead to the inexorable conclusion that the constitutional balance of interests tilts against permitting the Petros activity to be conducted within the school as a general activity program.

The judgment of the district court will be reversed.

ADAMS, Circuit Judge, dissenting.

Long before Lisa Bender and her fellow students formed Petros, the Williamsport Area High School had adopted its policy permitting any student group, so long as "legal and constitutionally proper," to meet during the activity period. Nothing in the record, the briefs, or the oral argument suggests that the high school sought by this policy to promote religious activity, or that a teacher or other school employee sponsored Petros, or that the activity period in any way encouraged attendance at Petros. Nonetheless, the majority holds that Petros must be excluded. Given the high school's conceded neutrality toward all student activities and the unquestioned voluntariness of an individual student's decision to attend any particular activity, the majority's conclusion essentially rests on the view that collective religious speech

Cong., 2d Sess. (1984) (allowing voluntary group religious activity *outside* of school hours only). Thus, while in normal course we would not comment upon the dissent's characterization, we believe it essential to correct any misperception which that characterization may occasion.

simply may not take place within the walls of a public secondary school without violating the Constitution.

This bright line rule—no prayer in public secondary schools—represents an easily applied interpretation of the Establishment Clause. Were the Court today writing on a clean slate, such an approach might be understandable. But in fact we are constrained by a substantial body of Supreme Court precedent seeking to define the bounds of permissible contact between incidental religious activity and the state. While I agree that the case before us is not completely free from doubt, I cannot join the majority's conclusion that the Establishment Clause, as construed by the Supreme Court, requires exclusion of Petros solely because of the religious content of its speech. In particular, I do not believe that Petros can be meaningfully distinguished from the student religious group permitted to meet in a public university by *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Because I cannot subscribe to the majority's wooden reading of the First Amendment, and because I believe the result reached today is at variance with controlling precedent, I respectfully dissent.

### I.

Less than three years ago, the Supreme Court held in *Widmar* that a state university could not deny a student prayer group the right to meet in school facilities on the same basis as other student groups. Declaring that the university's policy of accommodating the meetings of student activities "created a forum generally open for use by student groups," 454 U.S. at 267, 102 S.Ct. at 273, *Widmar* required that any content-based exclusion from that forum be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Id.* at 270, 102 S.Ct. at 274.

*Widmar* made it clear that the Bible reading, prayer, and religious discussion of a student group were protected forms of speech no less than the discussions of the Students for a Democratic Society or the Young Socialist Alliance. *See id.* at 269 n. 6, 274, 102 S.Ct. at 274 n. 6, 276. Thus, before excluding the prayer group from campus, the university was required to meet the same exacting scrutiny applied to any discrimination against speech.

The university in *Widmar* proffered only one state interest for excluding all religious activity and teaching from campus: that to permit it would violate the establishment clause. The Court squarely rejected the idea that the constitution justified exclusion of a group engaging in religious speech. Applying the three-prong test from *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971),[1] it was determined that the requirements of a "secular purpose" and of "[non-]entanglement" were "clearly met" by a policy that accommodated the prayer group on the same basis as other student groups. *Id.* at 271, 102 S.Ct. at 275.

As for the question of "primary effect," the Court relied on two factors in concluding that any benefit to religion from permitting the prayer group to meet would be "incidental": first, the fact that "an open forum in a public university does not confer any imprimatur of State approval on religious sects or practices"; and second, that "the forum is available to a broad class of nonreligious as well as religious speakers." *Id.* at 274, 102 S.Ct. at 276.

The situation at Williamsport is strikingly similar to that presented in *Widmar.* As in *Widmar,* Williamsport adopted a policy permitting all student groups to meet during the activity period, and thereby created a forum generally open to student activities. Also as in *Widmar,* a group of

---

1. Under the *Lemon* test, a governmental policy will not offend the Establishment Clause if it satisfies the following three requirements:

 First, the [governmental policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the [policy] must not foster "an excessive government entanglement with religion."

 *Lemon, supra,* 403 U.S. at 612–13, 91 S.Ct. at 2111.

students, on their own initiative decided to form Petros to pray as well as to read and discuss the Bible, rather than go to the French Club, the Bowling Club, the library or any number of other activities. Also, like *Widmar*, Williamsport's activity period is open to a wide variety of interests—some 25 student clubs, in addition to a number of other non-club activities. However, unlike *Widmar*, the open forum at Williamsport is not at a public university, but at a high school.

The majority believes that the distinction between a university and high school forum is itself dispositive. To my mind, however, Williamsport still bears the burden of coming forward with a compelling state interest to support exclusion of Petros. The high school's contention that the Establishment Clause supplies such a compelling interest must be analyzed in the same manner as was the identical claim by the university in *Widmar*. Permitting Petros to meet during a generally open activities period would, in my view, clearly have a secular purpose and avoid excessive entanglement. The only difficult issue is, therefore, whether accommodation of Petros would be perceived as government endorsement of religion and would, as a result, have the primary effect of advancing religion.

Thus the pivotal question in this case is whether a small group in a high school that prays and reads the Bible is sufficiently different from a small group in a university that engages in similar activity, so as to distinguish *Widmar*. To support the conclusion that Petros must be excluded, the majority focuses primarily on the fact that high school students are less mature and more impressionable than university students.

## II.

As a general matter, high school students are on the average less mature and more impressionable than college students. Nonetheless, this generalization does not end the inquiry in this case. As I read the case law governing speech rights of stu-

dents in publicly-supported schools, there is no clear constitutional distinction based on the comparative intellectual capacities of 14–18 year olds as opposed to 18–22 year olds. Particularly in this case, where the school authorities have previously determined that Williamsport students are sufficiently independent to make good use of a period open to student-initiated activities, it seems improvident for a court to forge a constitutional principle, with all the rigidity which it so frequently creates, from vague impressions of the emotional sophistication of high school students.

As the Supreme Court has made clear, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Thus a student

> may express his opinions even on controversial subjects ... if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others.

*Id.* at 513, 89 S.Ct. at 740. This teaching has been applied by the Supreme Court to protect the right of students attending junior or senior high school to wear armbands in protest against the Vietnam War, *see Tinker*, and the right of elementary and secondary school students not to salute the flag or pledge allegiance to it. *See West Virginia Board of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Although the exact scope of First Amendment rights within public secondary schools is somewhat unclear in the wake of *Board of Educ. Island Trees v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), most of the Justices conceded in that case that free speech principles bar a school board from certain content-based regulations on purchasing books for a high school library, such as the refusal, for narrowly partisan reasons, to buy books by Democrats or by Blacks. *Id.* 102 S.Ct. at 2810 (Brennan, J. for plurality); 2813

(Blackmun, J. concurring); 2828–29 (Rehnquist, J. dissenting).

Undergirding decisions such as *Tinker, Barnette* and *Pico* is the notion that students in secondary schools are citizens-to-be and that they can, to some extent, both contribute to and learn from participation in a free exchange of views. As the Supreme Court has acknowledged, the public schools are vitally important institutions "in the preparation of individuals for participation as citizens" and for "inculcating fundamental values necessary to the maintenance of a democratic political system." *Ambach v. Norwick*, 441 U.S. 68, 76–77, 99 S.Ct. 1589, 1594–95, 60 L.Ed.2d 49 (1979). The *Barnette* Court reasoned that the fact that public schools

> are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

319 U.S. at 637, 63 S.Ct. at 1185. Thus the Court in striking down a New York law requiring that all teachers in the state's educational system certify that they were not members of the Communist party declared,

> [t]he classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than

through any kind of authoritative selection."

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (citations omitted).

Recognizing that students—especially those in high school—have the ability to participate in a marketplace of ideas, federal courts have repeatedly invoked the First Amendment to limit the authority of public officials to control the student body's exposure to views not endorsed by the school board.[2] Thus in *James v. Bd. of Ed., supra* note 2, the Second Circuit expressly relied on the high school student's ability to distinguish between the official views of the school board and the personal opinions of a teacher as a basis for upholding a teacher's right to wear an armband in protest against the Vietnam War: "[i]t does not appear ... that any student believed the armband to be anything more than a benign symbolic expression of the teacher's personal views." 461 F.2d at 574. As the *James* Court concluded,

> it would be foolhardy to shield our children from political debate and issues until the eve of their first venture into the voting booth. Schools must play an essential role in preparing their students to think and analyze and to recognize the demagogue.

*Id.*[3]

It is inconsistent to accept, on the one hand, a level of intellectual sophistication among high school students sufficient to consider and contribute to the exchange of

---

**2.** *See Russo v. Central School Dist. No. 1,* 469 F.2d 623 (2d Cir.1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); *James v. Board of Education,* 461 F.2d 566 (2d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972); *Shanley v. Northeast Indep. School Dist.,* 462 F.2d 960 (5th Cir.1972); *Bayer v. Kinzler,* 383 F.Supp. 1164 (E.D.N.J.1974); *aff'd mem.,* 515 F.2d 504 (2d Cir.1975); *Wilson v. Chancellor,* 418 F.Supp. 1358 (D.Or.1976); *Gambino v. Fairfax City School Bd.,* 429 F.Supp. 731, (E.D.Va.1977).

**3.** In a similar context, Judge Rosenn has recently observed that

> the court can take judicial notice of the progressively higher levels of intellectual and

emotional development of students in the later grades of secondary school.

*Seyfried v. Walton,* 668 F.2d 214, 219–20 (3d Cir.1981) (Rosenn, J., concurring).

There is empirical evidence that appears to support judicial notice of the high school student's intellectual maturity. According to one commentator's survey of recent studies of adolescent psychology, adolescents, by age 14–15, gain the sophisticated cognitive capacity necessary to form their own ideas, to disagree with the views of peers and authority figures, and to establish the personal ideals and values of self-identity. *See* Note, The Constitutional Dimensions of Student-Initiated Religious Activity in Public High Schools, 92 Yale L.J. 499, 507–509 (1983).

controversial views and yet, on the other hand, to declare them incapable of discerning the distinction between a school's creation of a public forum that may permit religious speech and an endorsement of such activity. To be sure, broad generalizations about the maturity of high school students should not be erected as constitutional principle. But where, as here, the school has officially recognized that its students are sufficiently mature to benefit from two 30-minute periods per week committed to student-initiated activities,[4] and where the school's evaluation of its students' maturity is borne out by their independent decisions to participate in a wide range of activities,[5] a court may properly conclude that at least these students are capable of distinguishing the creation of a student forum from approval of the ideas expressed at any particular meetings. In the words of *Widmar, I* "doubt students could draw any *reasonable* inference of [school] support from the mere fact of a campus meeting place." 454 U.S. at 274 n. 14, 102 S.Ct. at 276.

In discussing the existence of a generally open forum at Williamsport, the majority acknowledges the significance of the school's open access policy. It properly notes that the policy "encourages students to exercise independent judgment," Maj.Op. at 549, and represents an institutional commitment to

> a forum for self-expression, by which students exercise their own discretion in deciding which organization, if any, to support.

Maj.Op. at 548.[6] Having recognized that Williamsport's activity period presupposes a certain independence of intellect on the part of the students, the majority appears to be inconsistent in holding that Williamsport's students are not sufficiently mature to understand the policy behind the creation of a neutral forum for all groups, including Petros.

To the extent the majority is concerned about impressionability of high school students, they are required to consider that the exclusion of Petros will introduce content-based restrictions in an otherwise open forum that may in fact be understood as a manifestation of official hostility towards religion. It is well settled that the First Amendment proscribes governmental hostility towards religion, as well as governmental promotion of religion. *See Lynch v. Donnelly*, — U.S. —, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) ("a government practice [must] not have the effect of communicating a message of government endorsement or disapproval of religion") (O'Connor, J., concurring); *Committee for Public Educ. v. Regan*, 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *Lemon, supra*, 403 U.S. at 612, 91 S.Ct. at 2111. When this Court sustains Williamsport's decision not to permit meetings by Petros, it sanctions a policy singling out a religious group as the only student activity ever to be excluded in the high school's history. In light of its view of the maturity of high school students, the majority it seems to me, is obligated to explain why such a selective exclusion does not raise First Amendment problems of perceived government disapproval of religion.[7]

---

4. Williamsport's principal made it clear that the school's policy is to permit any student organization deemed "legal and proper." *See Bender, supra*, 563 F.Supp. at 706.

5. When this case arose, over 25 student activities were formally recognized and functioning at the school. *Bender, supra*, 563 F.Supp. at 706. In past years, some 15 other clubs had been organized and could be re-activated. App. at 367.

6. Indeed, unlike compulsory instructional classes, which are created and designed by the school authorities, the very existence of such organizations depends entirely upon voluntary student participation and interest.

Unlike the case of prisons or military bases, the exercise of this qualified freedom to participate in the group of one's choice is quite consistent with the special purpose for which the high school is intended—the preparation of youth for adult life and adult decisions.

7. *See Civil Liberties Union v. Lubbock Indep. School Dist.*, 680 F.2d 424, 426 (1982) (Reavley, J., dissenting from denial of rehearing en banc) ("We should not forget, however, that the young student may also be given the impression that our government and the courts and the schools

## III.

Putting to one side the majority's position that the limited intellectual development of the high school student is sufficient cause for excluding Petros, in my view the other factors cited by the majority to distinguish *Widmar* are, at least in the context of the Williamsport activity period, not persuasive.

## A.

Seeking to bolster its conclusion that permitting Petros to meet will have a primary effect of advancing religion, the majority points to three institutional distinctions between the high school and the university: (1) that high school's students are compelled to attend by the state's truancy laws; (2) that a high school needs an adult monitor to insure discipline; and (3) that a high school building is physically more confining than a college campus. The predicted effect of these institutional differences—that the presence of Petros will be perceived as state endorsement of religion—represents uncorroborated speculation without any basis in the record. Inasmuch as *Widmar* commands that the state produce evidence of a compelling interest to justify a content-based exclusion from a generally open forum, the majority's reliance on these three distinguishing factors appears misplaced.

It is true that under Pennsylvania law, school attendance is compulsory until age seventeen.[8] But in view of the voluntariness of a student's decision to attend a specific activity, the fact of compulsory attendance is irrelevant. As the majority observes, "the very existence of [the clubs]

depends entirely upon voluntary student participation and interest." Maj.Op. at 548; *see also* Maj.Op. at 543 ("Participation in activities is completely voluntary"). The coercive power of the state in no way favors a student's decision to select any particular activity. So long as a student is recorded as present somewhere in the school building, whether he or she chooses to stay in the homeroom, study in the library, work at the computer station, or attend any one of the more than 25 student clubs is of no concern to the school authorities. Especially when the student is presented with such a wide range of options, and when attendance at any one of those activities requires the student's affirmative movement away from the homeroom, I do not see how it can be suggested that attendance at Petros is compulsory in any sense that is troublesome under the Establishment Clause.

The majority's concern that the presence of an adult monitor at Petros meetings would create an impression of official endorsement is similarly not justified by the record.[9] According to the affidavits, the faculty monitor at the first meeting of Petros did not in any way participate in the meeting. The monitor took attendance, then spent the remaining time grading papers. App. at 227–28, 401–02. In their complaint, the students specified that the faculty advisor would be present "solely for purposes of ensuring good order and not for any purpose related to the religious content of the meetings." App. at 20 (Complaint ¶ 57(C)). Moreover, before the district court the students offered to with-

---

are hostile to all religious belief and practice. I would consider that a very great wrong to the children, to the Constitution, and to our. nation.").

**8.** 24 Pa.Stat.Ann. §§ 13–1326, 13–1327 (1983). High school students generally reach their seventeenth birthday sometime during their junior year. Thus at a four-year high school like Williamsport, a significant number of the students are not subject to compulsory attendance laws.

**9.** Nor does the mere presence of an adult monitor approach the level of state sponsorship

found in *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) or *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). In *Schempp*, which involved the required daily reading from the Bible in public school, and *Engel*, which concerned the required recitation of a daily prayer, the state effectively mandated a particular religious practice. Also since the classroom context was such that excusal was likely to cause embarrassment, the state commandment of religious activity affected all students.

draw the request for an advisor, for any purpose. *See Bender, supra,* 563 F.Supp. at 715. Nonetheless, out of an abundance of caution, I would, if I were in the majority, require that Petros meetings be monitored by a non-teacher.[10] Having taken this extra measure of protection, I see no possibility that the monitor's presence—"only to ensure orderly meetings," *id.* at 715—could be misconstrued as school endorsement of Petros.

The majority's other suggestion—that the small size of a high school campus increases the visibility of a group such as Petros—is also pure conjecture. Although *Widmar* never intimated that the constitutionality of an equal access policy depends on the visibility of a group, the Court there did note that some prayer group meetings were held in the student center, 454 U.S. at 265 n. 2, 102 S.Ct. at 272 n. 2, a location that is generally highly visible in a university community. By contrast, the affidavits here indicate that Petros was assigned to meet in the school cafeteria, App. at 228, a location that is typically *not* in use at the beginning of a high school day. Given that 2,500 students attend Williamsport High School (more than at the campuses of some state colleges), and that 20 to 45 students attended Petros, it seems particularly speculative for the majority to suggest that "students of differing or conflicting creeds would ... be less able to overlook" Petros than would be the case in a university campus. Maj.Op. at 552. Absent some evidence bearing on Petros' visibility, the majority's reliance on this factor would appear to be inappropriate to the resolution of a constitutional issue as weighty as the one before us.

### B.

Besides distinguishing the high school from the university, the majority also looks to the distinction between permitting religious activity within a school building, rather than away from school premises. The majority seeks support from *Illinois*

*ex rel. McCollum v. Bd. of Ed.,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), and *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), for the proposition that accommodating *any* religious activity in a public school building will convey an impermissible message of government endorsement. In my view, this reading of *Zorach* and *McCollum,* while perhaps helpful in explaining the somewhat inconsistent results of those two decisions, is of little assistance outside their setting of school-sponsored religious activity.

Both *Zorach* and *McCollum* address the validity of "excused time" programs under which students were permitted to receive religious instruction from denominational church groups during regular school hours. The main factual difference between the two programs is that in *Zorach* students left the school building for their instruction, while in *McCollum* they stayed in the classroom. Focusing on the fact that in these two excused time cases only the *McCollum* arrangement was struck down, the majority suggests that in the case before us the Establishment Clause boundary should likewise be set at the walls of the school facility. This attempt to extend *Zorach* and *McCollum* is, I believe, misguided because those cases so clearly raised the spector of government-endorsed and even government-coerced religious activity. As the *McCollum* Court noted, students were released from their legal duty of education within the secular curriculum "upon the condition that they attend the religious classes." 333 U.S. at 209, 68 S.Ct. at 464. Indeed, the *Widmar* Court emphasized the peculiar problem of government sponsorship inherent in a released time period established solely for religious activity:

> Because this case involves a forum already made generally available to student groups, it differs from those cases in which this Court has invalidated statutes permitting school facilities to be used for instruction by religious groups, but *not* by others. *See, e.g., McCollum*

---

**10.** School policy does not require that a faculty member serve as advisor to a club. The adult monitor may be another school employee or a parent. App. at 404.

*v. Board of Education,* 333 U.S. 203 [68 S.Ct. 461, 92 L.Ed. 649] (1948). In those cases the school may appear to sponsor the views of the speaker. 454 U.S. at 272 n. 10, 102 S.Ct. at 275 n. 10. Thus, notwithstanding any suggestion of *McCollum* and *Zorach* to the contrary, *Widmar* makes clear that equal access of a prayer group in a generally open forum, even within a school building, does not itself constitute official promotion of religion. Moreover, in *McCollum* the school officials met with several church representatives and worked in "close cooperation" in promoting the religious program. 333 U.S. at 209, 68 S.Ct. at 464. That is clearly not the case here.

### C.

Conceding that the case could be decided on the basis of the "primary effect" test alone, the majority nevertheless goes on to argue that permitting meetings by Petros would violate the "excessive entanglement" test as well. The majority suggests that an "intimate and continuing relationship" between Petros and the school would develop from the necessity of "constantly ... interpret[ing]" Petros announcements to insure that no "religiously oriented material" would be communicated on the bulletin board, the public address system, or the school newspaper. Maj.Op. at 556. I believe this suggestion of entanglement rests on a misperception of the facts.

To eliminate any possible entanglement, the students of Petros agreed to forego completely the use of the bulletin board, the public address system, the school newspaper and the yearbook. *Bender, supra,* 563 F.Supp. at 713–14. As I understand the record, the students' proposal represents a simple, easily-administered rule: the Petros club shall not use any school media. I cannot see how this rule would require the sort of policing the majority fears. Thus, to my mind, the entanglement problem here should be analyzed as in *Widmar,* which concluded that the school "would risk greater 'entanglement' by attempting to enforce its *exclusion* of 'religious worship' and 'religious speech'."

454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11 (emphasis added).

The attenuated notion of entanglement advanced by the majority is, moreover, without support in the historic purposes of the Establishment Clause. The concept of excessive entanglement announced by the Supreme Court for the first time in *Walz v. The Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), is focused on whether a law or governmental practice engenders excessive involvement between church and state. The question is whether the statute or regulation at issue unduly interferes with religious activities, on the one hand, or contemplates continuing governmental surveillance of religious groups or institutions, on the other hand. In *Walz,* Chief Justice Burger noted that if churches and other religious institutions were not exempt from property taxes there would be excessive and indeed continuous entanglement when the tax collectors went to each church facility and examined it to determine the amount of assessment. Indeed, Justice Brennan in his concurring opinion did note that the termination of exemptions would give rise to tax liens, foreclosures and the direct confrontation and conflicts that follow in the train of such legal processes. *Id.* p. 691, 90 S.Ct. at 1423.

Justice Harlan, also concurring in *Walz,* added that the concept of excessive entanglement encompasses direct governmental involvement which engenders a risk of politicizing religion. "What is at stake as a matter of policy," he asserted, "is preventing that kind and degree of government involvement in religious life that ... is apt to lead to strife and frequently strain a political system to the breaking point." *Id.* 694, 90 S.Ct. at 1424. According to Justice Harlan, the theory embraces two prohibitions: excessive administrative involvement and political divisiveness.

In the very next case dealing with the subject, *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), Chief Justice Burger emphasized that un-

der the legislation then under consideration (direct financial aid to parochial schools), it would be necessary for public officials continuously to check on the teachers and what they were teaching, the text books that were being used, and the various school budgets to make certain that the parochial schools did not have a higher per pupil expenditure than the public schools. In addition, along the same lines pointed by Justice Harlan in *Walz*, the Court in *Lemon* was concerned about successive annual appropriations that would undoubtedly create political divisiveness.

The elements present in *Walz* and *Lemon* are a far cry from those present in the *Williamsport* situation.[11]

### IV.

In considering the larger implications of the present dispute, it is critical not to lose sight of the distinctions between this case and others involving religious activity in a secondary school. This is not a case like *Engel v. Vitale* or *Abington v. Schempp* in which the state was commanding every student to participate in a prayer or Bible reading exercise, in a setting where excusal might well embarrass the student. Nor is this case like *McCollum*, where the school authorities set aside a time dedicated to religious instruction. Here, by contrast, the religious activity is not traceable to any state law or school regulation. Rather, a small group of high school students wishes to gather on a purely voluntary basis to read the Bible and to pray. They seek to do this while their classmates are attending French Club, or Ski Club, or Drama Club. To deny these students the right to meet on the same basis as their fellow students is to ignore the fundamental differences between self-initiated and state-sponsored religious activity.

Perhaps the majority's concern stems not from the prospect of establishment of reli-

gion by the presence on the campus of Petros, but from the possibility of unconstitutional extensions of the Williamsport arrangement elsewhere. Motivated, for example, by the desire to promote religion, a school board might create a student activities period that in fact amounts to no more than a prayer period. Given the emotion surrounding the school prayer issue, the majority's apparent concern with extensions of the Williamsport case is perhaps understandable. I would first point out, however, that the clearly unconstitutional cases are different from the one before us, and can be dealt with as they arise. I would then suggest that we openly confront the dilemma of Establishment Clause adjudication that underlies these school prayer cases.

On the one hand, we can eliminate all uncertainty by adopting the *per se* rule implicitly used by the majority today: no prayer shall be permitted in public secondary schools. The clarity of that approach has its advantages. But on the other hand, we can continue to engage in the delicate task of balancing two distinct First Amendment interests. The presence of any religious activity in the public schools does evoke some concern regarding mandatory school prayer. At the same time, content-based restrictions on access to an open forum by state actors strikes at the heart of competing First Amendment values. *See Consolidated Edison v. Public Service Comm.*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980). Admittedly, sifting between these considerations on a case-by-case basis involves a considerably more difficult adjudicative task than a *per se* rule.

Nonetheless, on balance I am persuaded that the purposes of the First Amendment are better served by rejecting a *per se* rule, even in cases involving religion and the school. One of the great triumphs of America's constitutional experiment has

---

**11.** While there is precious little evidence supporting the conclusion that there was excessive entanglement here, it is also worth noting that the Supreme Court apparently has begun to question the reach of the excessive entangle-

ment approach. *See, e.g., Lynch v. Donnelly,* —— U.S. ——, 104 S.Ct. 1355, 1364–65, 79 L.Ed.2d 604 (1984) (Burger, C.J.); *id.* 104 S.Ct. at 1367 (O'Connor, J., concurring).

been the avoidance of religious factionalism in the political sphere. Our country's continued progress in this endeavor ultimately depends on the individual citizen's tolerance and respect for religious diversity. When the schools can teach such tolerance to our young citizens without impermissibly sponsoring religion, I believe the Constitution and the Nation are the better for it. At Williamsport, I believe that allowing Petros access to an open forum that has been created for no improper purpose falls on the permissible side of the First Amendment dividing line. Accordingly, I must respectfully dissent.

